```
                 IN THE UNITED STATES DISTRICT COURT FOR
                 THE DISTRICT OF MARYLAND, NORTHERN DIVISION

                                      *

JAMES R. BUECHLER, JR.,              *
Individually, and on Behalf
of All Others Similarly              *
Situated,
                                      *
      Plaintiffs,
                                      *
         v.                              CIVIL NO.:  WDQ-09-0227
                                      *
DAVCO RESTAURANTS, INC.
                                      *
      Defendant.
                                      *


   *     *     *     *     *     *     *     *     *     *     *     *     *
```

MEMORANDUM OPINION

James R. Buechler, Jr. ("Buechler"), for himself and others

similarly situated, sued DavCo Restaurants, Inc. ("DavCo") for

violations of the Fair Labor Standards Act ("FLSA").[1]  Pending

are DavCo's motion for summary judgment and Buechler's motions

to certify this suit as a collective action and to seal several

exhibits.  For the following reasons, DavCo's motion for summary

judgment and Buechler's motions to seal will be granted, and

Buechler's motion to certify will be denied.

---

[1]  29 U.S.C. § 201 *et seq.*

I.    Background[2]

DavCo is a franchisee of Wendy's International, Inc. and operates Wendy's® restaurants in Maryland, the District of Columbia, and Northern Virginia.  Richard H. Borchers Decl. ¶ 3, July 30, 2009.  Typically, each restaurant employs numerous hourly employees--the "crew"--and a three-person salaried management team, consisting of a general manager, a co-manager, and an assistant manager.  *Id*.  There are two shifts each day, opening and closing, and one manager is assigned to each.[3]

Davco's system of internal promotion allows crew members to become managers.  Richard H. Borchers Dep. 39:10-40:3, May 6, 2009.  A crew member may become a crew chief and then a certified shift supervisor ("CSS").  *Id*. 34:4-6, 35:14-36:1. The CSS position "has limited authority, but [it] allows an hourly employee to progress to an assistant manager level."  *Id*. 35:20-36:1.  The responsibility given to a CSS is determined by his aptitude and experience.  *Id*. 50:7-51:4.

---

[2]   For the purposes of this motion, the Court will draw inferences from the facts in the light most favorable to Buechler, the non-moving party. *See Matsushita Elec. Indus. Co. v. Zennith Radio Corp.*, 475 U.S. 574, 587 (1986).

[3]   The opening shift is from 7am to 4pm.  The closing shift is from 4pm to 2am.  James R. Buechler, Jr. 20:1-21:15, 47:18-20, May 4, 2009.  Because each manager is assigned 5 shifts each week, there is an extra management shift each week--the "swing shift."  *Id*. 22:7-23:21.  The swing shift typically runs from 11am-8pm, and during this time, there are two managers on duty. *Id*. 22:18-19.

When a CSS has proven his ability to manage, he is eligible for promotion to assistant manager.  Borcher Dep. 35:19-36:6. An assistant manager: (1) trains, monitors, and enforces food safety procedures; (2) works with the management team to meet sales goals; (3) manages controllable expenses--e.g., food, labor, and paper costs; (4) monitors inventory, orders products, and executes company cash, property, product and equipment policies; (5) manages, directs, and monitors his crew to achieve quality, service, and cleanliness standards; (6) maximizes retention of crew and participates in recruitment by interviewing and recommending candidates; (7) provides training for crew members; (8) anticipates and identifies problems and takes corrective action; and (9) performs all other job-related duties.  *See* Def.'s Mot. Ex. 6 at 1-4 [hereinafter Position Description].  In addition to managerial responsibilities, the manager on duty also works with the crew as needed, at the grill, a sandwich station, or a register.  Borcher Dep. 83:6-18; 84:13-85:17.  At night, when the restaurant has lower sales, managers are instructed to keep labor costs down by sending home unneeded crew and staffing stations themselves.  *Id*. 84:17-85:17.

In May 2003, Buechler began as a crew member at DavCo's North Point location ("Store 25") in Dundalk, Maryland. Buechler Dep. 11:12-14, 12:6-12.  As a crew member, Buechler

made sandwiches, ran the grill, or worked the register and cleaned the restaurant.  James R. Buechler Decl. ¶ 3, Sept. 1, 2009.  Less than a year later, Buechler was promoted to crew chief.  Buechler Dep. 14:10-14.  As a crew chief, he worked a station and trained and directed other crew members, helped to maintain health code compliance and manage food costs, and communicated discipline problems to management.  *Id*.

In March 2006, Buechler was promoted to CSS and received six weeks of management training.  *Id*. ¶ 4; Buechler Dep. 31:14-17.  As a CSS, Buechler had access to the safe and keys to the store, managed parts of a shift, and handled cash.  Buechler Dep. 29:3-6.  He also helped with assigning tasks to the crew, inventory control and facility cleanliness, crew orientation and training, and communication with the corporate office.  Buechler Decl. ¶¶ 5-6.

On October 9, 2006, Buechler was promoted to assistant manager with a starting salary of $29,000 a year and health benefits.  Def.'s Mot. Ex. 14; Buechler Decl. ¶ 7.  On November 7, 2006, he attended the "Basics Class," which reviewed DavCo's expectations for and the duties of an assistant manager.  Buechler Dep. 39:5-14.[4]  As an assistant manager, Buechler

---

[4]  Buechler also attended "Development Day" on February 20, 2007, and "Assistant Manager PR" on April 18, 2007.  Buechler Dep. 40:18-41:4, 43:20-44:4.

usually worked five closing shifts each week from 4pm to 2am. *Id.* 47:12-20; 53:20-21.  He was responsible for "running the shift and positions" and usually worked with 3-4 crew members to staff the grill, register, and sandwich stations.  *Id.* 57:2-10; Buechler Decl. ¶ 9.  During his assigned shift, Buechler would (1) manage the 10-hour shift,[5] (2) call in or release crew members as needed to meet the labor budget,[6] (3) direct the work of crew members,[7] (4) order supplies and food,[8] (5) complete an "incident log" of positive and negative crew performance,[9] (6) discipline crew members,[10] (7) sign off on repair work,[11] (8)

---

[5]   Buechler Decl. ¶ 9.  Buechler normally managed his shift alone but occasionally had the help of a CSS or another manager. *See* Buechler Dep. 47-55.

[6]   Buechler Dep. 168:5-8.

[7]   Buechler Dep. 57:1-10; Doug Smith Decl. ¶ 9, July 28, 2009.

[8]   Buechler Dep. 168:9-11, 176:10-177:5.  Buechler "rarely filled truck orders for products (food and paper) needed to support sales . . . [and] all truck orders were reviewed by and required prior approval from the General Manager."  Buechler Decl. ¶ 11.

[9]   Buechler Dep. 127-30.

[10]   Buechler Dep. 167:20-168:1.  Buechler "'disciplined' members of the crew by [oral] and written counseling, including issuance of a Letter of Reprimand or making a notation about a crew member, in the Incident Log . . . [but] write-ups and disciplinary actions were not encouraged and were routinely overturned by the General Manager.  [Buechler] escalated virtually all employee complaints to the General manager."  Buechler Decl. ¶ 13.

[11]   Buechler Dep. 169:5-9.

handle customer complaints,[12] (9) complete closing reports,[13] (10) receive applications from prospective employees,[14] and (11) train or provide orientation to crew.[15]   A typical manager was "usually helping other employees run[] a position, [and] doing a dozen different things" at once.   Buechler Dep. 186:16-19.

For each shift, Buechler was responsible for monitoring store performance and staying within his assigned "labor budget."   McDonald Decl. ¶ 8.   This required him to assess the restaurant's sales volume and send home or call in employees as needed.   *Id.*; Buechler Dep. 97-100.   Buechler could release crew members at will, but he was required to get the general manager's approval before calling in additional crew members, extending hours, or authorizing overtime.   Buechler Dep. 130-133.

According to Buechler, "there was virtually no change in [his] job duties [or] responsibilities" when he was promoted from CSS to assistant manager, except that his new position required longer hours and did not pay overtime.   Buechler Decl.

---

[12]   Buechler Dep. 168:2-4.

[13]   Buechler Dep. 168:12-14.

[14]   Mark Ramsey Decl. ¶ 10, July 28, 2009; Susan McDonald Decl. ¶ 6, July 28, 2009.

[15]   Buechler Dep. 67-81; Smith Decl. ¶ 6 ("I recall [Buechler] providing orientation training to two sisters who worked in [Store 132]:   Anna Pirese and Angie Pirese.").

¶ 8.  He estimates that he spent 75 percent of his time "running

a station or cleaning the store" and the remaining 25 percent

"cash handling, doing the closing reports, the small inventory

list . . . or handing out breaks and . . . giving small

delegations."  Buechler Dep. 167:5-6, 16-19.  "On a few

occasions, [Buechler] provided some input about friends of [his]

who had applied for jobs,"[16] but he had no authority to hire or

fire and did not interview job applicants.  Buechler Decl. ¶ 12.

Most of the decision that Buechler made "had to go through a

manager above [him]" unless they were "very quick, on the fly,

low-level decisions."  Buechler Dep. 173:8-11.

     From November 14, 2006 to October 7, 2007, Buechler worked

as an assistant manager at Store No. 25 with general manager

Mark Ramsey and co-manager Susan McDonald.  *Id*. 45:3-18, 46:20-

21.  He was then transferred to the White Marsh location ("Store

---

[16]  Managers at Store 25 sought Buechler's opinion about
applicants and gave his input serious consideration.  *See* Ramsey
Decl. ¶ 10 ("Sometimes I would seek [Buechler's] opinion about
applications that I received.  Since [Buechler] lived in the
area surrounding the store, he knew many of the young people who
applied for jobs and was able to provide me with information as
well as a recommendation as to the candidate's suitability.  I
gave [Buechler's] input serious consideration or weight, and I
can recall the names of at least two of the employees whom I
hired on [his] recommendation:  Brandon Grayson and Christina
Young); McDonald Decl. ¶ 6 ("[Buechler] would make recommend-
ations as to positions in the store that needed to be filled,
and [Ramsey] and I would act on his recommendation.").  The
general manager at Store 132 also requested and acted on
Buechler's hiring recommendations. *See* Yvonne Mumpower Dep.
182:4-17, 270:9-271:11.

132"), where he worked with general manager Yvonne Mumpower and co-manager Doug Smith,[17] from October 7, 2007 to June 4, 2008. *Id.* 50:16-20, 51:14-16.  Buechler was then reassigned to Store 25 but went back to Store 132 on June 28, 2009, when Mumpower became ill.  Ramsey Decl. ¶ 6.  In October 2008, Buechler returned to Store 25 and remained there until his resignation on December 31, 2008.  *Id.*

II.  Analysis

    A.   DavCo's Motion for Summary Judgment

        1.   Standard of Review

Under Rule 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

---

[17]   Occasionally, there was a second co-manager, Donna Birchfield.  51:20-53:6.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).

> 2. Fair Labor Standards Act

Buechler contends that DavCo violated the FLSA by failing to pay its assistant managers for overtime. Compl. ¶¶ 9, 35. DavCo argues that assistant managers are within the executive exemption to the FLSA and thus are not entitled to overtime pay. Def.'s Mot. 18.

The FLSA requires that employees who work more than 40 hours in a week be paid overtime at a rate of at least one and a half times their usual hourly pay. 29 U.S.C.A. § 207(a)(1). Those "employed in a *bona fide* executive, administrative, or professional capacity" are exempt from this requirement. *Id.* § 213(a)(1). A *bona fide* executive employee is one: (1) salaried at not less than $455 per week, (2) whose primary duty is management of the enterprise or a subdivision thereof, (3) who regularly directs the work of two or more other employees; and (4) who is authorized to hire or fire employees or whose

suggestions and recommendations with respect to employees'
hiring, firing, advancement, promotion or any other change of
status are given particular weight.  29 C.F.R. § 541.100(a).
DavCo bears the burden of proving that Buechler's job is within
this exemption.  *See Darveau v. Detecon, Inc.*, 515 F.3d 334, 337
(4th Cir. 2007).[18]

### i.   Salary

It is undisputed that DavCo paid Buechler a salary of
$29,000 a year.  This exceeds executive pay of $455 per week.[19]

### ii.  Primary Duty

As an assistant manager, Buechler was responsible for
numerous "management" duties, but he contends that management
was not his "primary duty" because he had little discretion and
spent 75 percent of his time on non-exempt work, such as running
registers, operating the grill, and cleaning the store.  Pl.'s
Opp. 9-11.

"Management" activities include:

> interviewing, selecting, and training of employees; setting
> and adjusting their rates of pay and hours of work;
> directing the work of employees; maintaining production or
> sales records for use in supervision or control; appraising
> employees' productivity and efficiency for the purpose of
> recommending promotions or other changes in status;
> handling employee complaints and grievances; disciplining

---

[18]   "Exemptions from coverage are construed narrowly against
those asserting them."  *Jones v. Virginia Oil Co.*, 69 Fed. Appx.
633, 636 (4th Cir. 2003).

[19]   A $29,000 salary is about $558 per week.

employees; planning the work; determining the techniques to
be used; apportioning the work among the employees;
determining the type of materials, supplies, machinery,
equipment or tools to be used or merchandise to be bought,
stocked and sold; controlling the flow and distribution of
materials or merchandise and supplies; providing for the
safety and security of the employees or the property;
planning and controlling the budget; and monitoring or
implementing legal compliance measures.

29 C.F.R. § 541.102 (2009).  An employee need not take part in
all of these activities, but his "primary duty" must be
management to fit within the exemption.

An employee's "primary duty" is the "the principal, main,
major, or most important duty that the employee performs."  29
C.F.R. § 541.700(a) (2009).  An employee's "primary duty" is
determined by a totality of the circumstances analysis.  *Id*.
Considerations include:

the relative importance of the exempt duties as compared
with other types of duties; the amount of time spent
performing exempt work; the employee's relative freedom
from direct supervision; and the relationship between the
employee's salary and the wages paid to other employees for
the kind of non-exempt work performed by the employee.

29 C.F.R. § 541.700(a) (2009).

a.   Relative Importance of Exempt Duties

Buechler contends that his work at a food station or
register with the crew was of equal or greater importance to
DavCo as his managerial duties.  Pl.'s Opp. 10-11.  To determine
the relative importance of an employee's managerial to
nonmanagerial tasks, courts consider "the significance of the

managerial tasks to the success of the facility." *Jones*, 69
Fed. Appx. at 637-38 (*quoting Haines*, 939 F. Sup. at 450).
*Jones* held that an assistant manager responsible for hiring,
scheduling, training, disciplining, checking inventory, ordering
supplies, handling customer complaints, counting daily receipts,
and making bank deposits was critical to Dairy Queen because the
restaurant "could not have operated successfully unless [she]
performed her managerial functions." *Id*. at 638.  Here,
Buechler's tasks were similarly important to Wendy's.

During his shift, Buechler was usually the only manager on
duty, and he had sole responsibility for the operation of the
restaurant.  Buechler explained that a "manager is usually
helping other employees running a position [and] doing a dozen
different things" at once.[20]  He was simultaneously responsible
for working at stations as needed, directing and disciplining
the crew, inventorying and ordering necessary supplies,
addressing customer complaints, sending home unneeded staff,
training crew members, approving facility repairs, and reporting
daily receipts to the corporate office.  He had to determine the
number of employees to stay within the assigned labor budget and
run the restaurant efficiently.  His responsibilities directly
influenced the restaurant's success; Buechler, as assistant

---

[20]   Buechler Dep. 186:16-19.

manager, was essential to the operation of the facility during his shifts.

### b.   Time Performing Exempt Work

Buechler contends that running registers, operating the grill, cleaning the store, and performing other crew tasks occupied 75 percent of his time, and only 25 percent was spent managing.  Buechler Dep. 167:2-14.

Although the time spent performing exempt work is one factor to consider, it is not the "sole test," and the regulations do not "require[] that exempt employees spend more than 50 percent of their time performing exempt work."  29 C.F.R. § 541.700(b) (2009).  This is "particularly [true] when non-management duties are performed simultaneous to the supervision of employees or other management tasks."  *Jones*, 69 Fed. Appx. at 637 (*quoting Horne v. Crown Cent. Petroleum, Inc.*, 775 F. Supp. 189, 190 (D.S.C. 1991)).[21]  "Generally, exempt

---

[21] "[A] number of federal courts have disregarded the time factor . . . where the manager is in charge of a . . . convenience store or restaurant chain."  *Jones*, 69 Fed. Appx. at 637 (*quoting Haines v. S. Retailers, Inc.*, 939 F. Supp. 441, 445 (E.D. Va. 1996)); *see also Posely v. Eckerd Corp.*, 433 F. Supp. 2d 1287, 1303 (S.D. Fla. 2006)(following "the overwhelming and well-reasoned precedent holding that retail store managers who are charged with maintaining proper functioning of their stores are exempt employees" even when 80 percent of their work was non-exempt); *Donovan v. Burger King Corp.*, 675 F.2d 516, 521-22 (2d Cir. 1982)(assistant managers at Burger King had the "primary duty" of management even though over 50 percent of their time was spent on non-exempt work).

executives make the decision regarding when to perform non-exempt duties and remain responsible for the success or failure of business operations under their management while performing the non-exempt work."  29 C.F.R. § 541.106(a) (2009).  By contrast, non-exempt employees are "directed by a supervisor to perform the exempt work or perform the exempt work for defined time periods."  *Id.*

Viewed in the light most favorable to Buechler, the evidence shows that he spent more than half his time performing non-exempt work.  But, while Buechler was working with the crew, he was simultaneously supervising and directing the other employees.[22]  Depending on the needs of the restaurant and the capabilities of his crew, Buechler decided if he worked a station and for how long.  In his 25 percent management time estimate, Buechler admits spending a larger proportion of his time on managerial tasks than other retail and restaurant managers who have been found exempt as a matter of law.[23]  Here,

---

[22] *See, e.g., Jones*, 69 Fed. Appx. 633 (Time alone was not determinative when the plaintiff "engaged in the supervision of employees, handled customer complaints, dealt with vendors, and completed daily paperwork" while doing line-worker tasks).

[23] *See, e.g., Mims v. Starbucks Corp.*, No. H-05-0791, 2007 WL 10369, *6 (S.D. Tex. 2007)(70 to 80 percent of manager's time spent performing barista work, such as making drinks and operating registers); *Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323, 1334-35 (N.D. Ga. 2005)(90 percent of assistant managers' time spent performing non-exempt tasks); *Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268, 1273-74 (S.D.

time must be considered with the other factors in determining Beuchler's "primary duty." *See Jones*, 69 Fed. Appx. at 637.

### c.   Relative Freedom from Supervision

Buechler contends that he "had little freedom from direct supervision" because of "corporate micromanagement, close district manager oversight, and fixed payroll budgets." Pl.'s Opp. 11.  Buechler was required to obtain the general manager's approval before authorizing overtime or calling in extra employees to work a shift.  His reprimands of crew members and supply orders were similarly subject to upper-management oversight.  Buechler was also responsible for adhering to the labor budget and employee schedule prepared by the general manager.

That Buechler was required to "adhere to certain guidelines or in certain instances obtain the Store Manager's approval does not diminish [his] discretionary powers." *Haines*, 939 F. Supp. at 450.  Employees may be relatively free from supervision even if they "need to obey corporate policy [or] follow the orders of their corporate superiors." *Posely*, 433 F. Supp. 2d at 1302. Buechler had discretion to run the operations of his shift within established budgetary and labor guidelines.  Certain

---

Fla. 2004)(95 percent of store manager's time spent on non-exempt work); *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 866-67 (N.D. Tex. 2001)(90 percent of bakery department manager's time spent on non-managerial tasks).

decisions required prior or subsequent approval, but Buechler
had relative freedom from supervision.

>                    d.    Salary Compared to Other Employees for
>                          Non-exempt Work

Buechler estimates that he earned two to three dollars more
per hour than a CSS, the highest paid crew position.  Pl.'s Opp.
11.  "A marked disparity in pay and benefits between Plaintiffs
and the non-exempt employees is a hallmark of exempt status."
*Mims*, 2007 WL 10369 at *8.  Buechler's $29,000 salary was a
marked increase from his annual pay as a CSS.[24]

This difference in compensation, the importance of
Buechler's managerial duties, and his relative freedom from
supervision show that his "primary duty" was management.

>              iii. Regularly Directed More than Two Employees

Buechler admits that he "was responsible for the activities
of . . . 3-4 crew members during the entire shift."  Buechler
Decl. ¶ 3.  Thus, this exemption criterion has been met.

>              iv.  Particular Weight

Buechler contends that "numerous issues of fact exist as to
whether [his] suggestions and recommendations [about] the
hiring, firing, advancement, promotion or any other change of
status of other employees [were] given particular weight."

---

[24]  If Buechler worked 50 hours every week as a CSS, he
would have earned $24,310 annually (based on an $8.50 per hour
wage and time and a half for overtime).

Pl.'s Opp. 12.   Whether "particular weight" is given to an

employee's suggestions and recommendations depends on:

> whether it is part of the employee's job duties to make
> such suggestions and recommendations; the frequency with
> which such suggestions and recommendations are made or
> requested; and the frequency with which the employee's
> suggestions and recommendations are relied upon.

29 C.F.R. § 541.105 (2006).   Even if an employee is not the

ultimate decision maker and the recommendations of a higher

level manager are more important, his opinions still may have

"particular weight."   *Id.*

As an assistant manager, Buechler could not hire or fire.[25]

His job description lists "interviews and recommends candidates

for selection" among the duties of an assistant manager.[26]

Mumpower, Ramsey, and McDonald requested and relied on his

recommendations, and Buechler acknowledges that he "provided

some input about friends of [his] who had applied for jobs."[27]

There is no evidence of the frequency with which Buechler's

opinion was requested or relied upon to make employment

decisions.   Ramsey recalled two employees he hired on Buechler's

recommendation at Store 25.[28]   Mumpower also asked for and acted

---

[25]   Mumpower Dep. 182:18-183:10.

[26]   Def.'s Mot. Ex. 6 at 3.

[27]   Buechler Decl. ¶ 12.

[28]   *See* Ramsey Decl. ¶ 10.

on Buechler's hiring recommendations "from time to time" at

Store 132.[29]  Buechler also reported the problems with and praise

for employees in the incident log and reprimand forms used to

evaluate crew members for raises and promotion.[30]

Buechler has not refuted DavCo's evidence that part of his

job was to make employment suggestions, Ramsey hired two

employees upon his suggestion, Mumpower requested and used his

hiring recommendations, and his recorded reprimands and praise

were used in employment decisions.  Accordingly, Buechler's

suggestions and recommendations were given particular weight.

As Buechler was an exempt employee, DavCo's motion for

summary judgment will be granted.

> B.   Buechler's Motions to Certify as Collective Action and
>      Interim Motions to Seal Exhibits

Because DavCo will be granted summary judgment, Buechler's

motion to certify this suit as a collective action is moot and

will be denied.  As there is no opposition, his motions to seal

Exhibit C to Paper No. 9, Exhibit A to Paper No. 23, and

Exhibits B and F to Paper No. 24 will be granted.

III. Conclusion

For the reasons stated above, DavCo's motion for summary

judgment and Buechler's interim motions to seal exhibits will be

---

[29]   Mumpower Dep. 270:21-271:10.

[30]   Ramsey Decl. ¶ 9.

granted, and Buechler's motions to certify as collective action will be denied.


November 16, 2009                    _____/s/_____
Date                                 William D. Quarles, Jr.
                                     United States District Judge